UNITED STATES of America

v.

WATTSBURG AREA SCHOOL
DISTRICT and William J.
Gregg, Supt.

Civ. A. No. 76–101.

United States District Court,
W. D. Pennsylvania.

April 18, 1977.

Joel B. Strauss, Asst. U. S. Atty., Pittsburgh, Pa., Alexander C. Ross, Dept. of Justice, Washington, D. C., for the United States.

William T. Jorden, Erie, Pa., for defendants.

ADJUDICATION
FINDINGS OF FACT, DISCUSSION
AND CONCLUSIONS OF LAW
KNOX, District Judge.

INTRODUCTION

This is a sex discrimination suit instituted by the United States alleging that Mary Schaaf an applicant for a teaching position in the defendant school district was refused employment because of sex. The action is brought under 42 U.S.C. § 2000e ėt seq. the educational amendments to which effective March 24, 1972, made Title VII of the Civil Rights Act of 1964 applicable to local school districts and educational entities. The school district is subject to the act by virtue of the provisions of Sections 2000e(a), (b) and (h). Complaint having been made of refusal to hire to the Equal Employment Opportunities Commission, which found reasonable cause for the action, and the school district having refused to take action, suit was brought by the Attorney General pursuant to the provisions of 2000e–5(f)1.

The court hereby makes the following:

*Specific Findings of Fact*

1. The Wattsburg Area School District is an agency of the Commonwealth of Pennsylvania, organized under the laws of

the Commonwealth, and is responsible for administering the Commonwealth's system of public education in the Wattsburg Area.

2. Defendant William J. Gregg, as Superintendent, is the principal administrator for the defendant school district. In the area of employment of permanent professional staff the Superintendent has the final approval of proposed new hires and makes his recommendation to the school board, which has the sole authority to hire.

3. Lavern Floyd Hurlburt, as Assistant Superintendent, is second in command of defendant school district and has the principal responsibility for screening permanent professional employees and recommending their employment to the Superintendent.

4. Billy D. Haney, as Principal of the Wattsburg Area Middle School, makes recommendations to the Assistant Superintendent and the Superintendent for the employment of permanent professionals at that school.

5. The Wattsburg Area School District is comprised of five schools. For the 1974–75 school year the breakdown by sex of the professional staff of the Middle School involved in this case was as follows:

Wattsburg Area Middle School (grades 5–8)

|  | Male | Female |
|---|---|---|
| Principal | 1 | 0 |
| Classroom Teachers | 11 | 20 |

6. Mary E. Schaaf received a bachelor's degree from Mercyhurst College in 1968, with a major in elementary education and a minor in mathematics. Her overall grade point average was 3.46 on a 4.0 basis, and her class rank was 8 out of 131. Her undergraduate grades consisted of 22 A's, 26 B's, and her lowest grade, one C, in physical education. Her student teaching grade was A.

7. Although she had not yet graduated from Mercyhurst, Schaaf was employed in January, 1968, as a fourth grade teacher in the Wattsburg District, teaching a self-contained class during the day, while completing her last three credits at Mercyhurst at night. After her graduation in June, 1968, Schaaf was continued by the District in her fourth grade position from September 1968 until January 1969, when she resigned to accompany her husband to his assigned position in New Castle, Pennsylvania. When she resigned from Wattsburg in January 1969 to relocate in New Castle, Schaaf received a letter of acknowledgement from the then Wattsburg Superintendent, Charles Anderson, wishing her the "best" and thanking her "for a fine teaching job." Schaaf's teacher evaluation forms, required by the Commonwealth and signed by the County Superintendent, and the District Superintendent indicate that she performed satisfactorily as a teacher for Wattsburg during 1968–69 (Pl.Ex. 1, 2, 8).

8. After residing in New Castle, Pennsylvania, for almost two calendar years, during which time she substituted in the Nantic Area School District and Wilmington Area School District for an estimated average of four days a month, and in the New Castle High School as a ninth grade mathematics temporary substitute for two full months, Schaaf relocated in Wattsburg in December 1970. During her tenure in New Castle, Schaaf began her graduate work by completing six graduate hours at Slippery Rock State College in the summer of 1969.

9. Schaaf reapplied to the Wattsburg Area District for a teaching position for the fall of 1971, and she was hired to teach kindergarten at the Greenfield Elementary School for the 1971–72 term. Because she was caring for her new baby, born in February 1970, Schaaf did not apply for work during winter and spring of 1971.

10. At the end of the school year in June 1972, because she and her husband had bought a house in Erie, where baby-sitting arrangements for her baby were unsatisfactory, Mrs. Schaaf resigned her teaching position at Greenfield. The conditions under which Schaaf had taught kindergarten at Greenfield were unusual in that because of the District's bus schedule restrictions, she taught two sections of kindergarten students simultaneously in a combined grouping in the school's gymnasium from one o'clock to five p. m. There is in evidence

(Pl.Ex. 5) one favorable evaluation by her principal of Mrs. Schaaf's teaching performance during the 1971–72 school year concluding "Very well done, Mary!"

Upon her resignation, Schaff again received an acknowledgement from Superintendent Charles Anderson, who, with reference to her teaching conditions, concluded by saying, "It was difficult I know but many persons have expressed themselves favorably with your results. Many thanks."

11. Although she frequently substituted in the District between 1972 and 1974, Mary Schaaf did not reapply for a permanent teaching position until the spring of 1974, when she found an acceptable day-care center for her four-year-old child.

12. On February 27, 1974, Mary Schaaf submitted to the District an application for a full-time teaching position for grades Kindergarten through 8 for the 1974–75 school year. Because of Mr. Spiegelhalter's, principal at Green Elementary School, frequent reliance on her for substitute work, Schaaf requested Spiegelhalter's permission to use him as a professional reference on her teacher application blank. Alice Bauman, the principal at Greenfield in 1971–72, who had praised her work there, was also listed as a reference. Schaaf also filed another application for the 5th Grade vacancy on May 8, 1975 (D X 6).

13. In August 1974, Schaaf was interviewed by Assistant Superintendent Hurlburt for both full-time and part-time vacancies at the elementary level. Because she wanted a permanent position, Schaaf rejected the offer Hurlburt made her of the part-time job, for September 1974 through January 1975. She was later informed by Hurlburt that the full-time job, a kindergarten position, was awarded to a person with a Master's Degree being higher than her own.

14. In January 1975, there were five fifth-grade teachers at the Wattsburg Area Middle School. Two of the five, John Shreve and Nancy Hinkler, had self-contained classrooms; that is, Shreve and Hinkler each had his own group of students all day, to which each taught all elementary subjects, except art, music, and physical education. The three other fifth-grade teachers had self-contained classrooms for part of the school day, but because of their relative strengths in certain subject areas, these three teachers exchanged students in consideration of these strengths. Christine Thayer taught an extra section of social studies; Richard Smith had an extra section of math and science, and Candace Edmonds taught an extra section of language arts.

15. In January 1975, the five fifth-grade teachers at the Middle School met with their principal, Billy Haney, and decided that beginning with the 1975–76 school year their grade would become departmentalized, with each teacher teaching only one academic subject to five different sections of fifth-graders. This proposal, mutually agreed upon by the five teachers and Mr. Haney, scheduled Mrs. Hinkler to teach math, Mr. Smith to teach science, Mrs. Edmonds to teach reading, Mrs. Thayer to teach English and spelling, and Mr. Shreve to teach social studies.

16. In February 1975, Dr. Hurlburt contacted Mary Schaaf and offered her a temporary substitute position completing the term of Christine Thayer, a fifth grade teacher at the Wattsburg Area Middle School who was taking maternity leave. Schaaf accepted and signed a temporary contract on February 17, and assumed Mrs. Thayer's teaching assignment on February 24, 1975, for the remainder of the term. Schaaf's schedule, like Thayer's, required her to teach one group of fifth graders all subjects, except science, for all but one period of the day, when she exchanged students with another fifth-grade teacher, Richard Smith, who taught Schaaf's students science while Schaaf taught Smith's students social studies. This meant that every school day Schaaf taught social studies to two separate groups of fifth-graders, her own and Richard Smith's.

17. While she was teaching fifth grade at the Middle School, Schaaf was observed in her teaching by Assistant Superintendent

Hurlburt several times, but she never received any oral or written evaluation or criticism, either favorable or unfavorable from Hurlburt. Nor did Schaaf experience any discipline problems, nor receive any complaints regarding her work from her principal, students, parents or co-teachers at the school.

18. On April 28, 1975, John Shreve, one of the male fifth grade teachers at the Middle School, gave written notice to the District of his intention to resign his teaching position, effective the end of the semester. At the time of Shreve's notice of intent to resign, Mary Schaaf was serving the District in a capacity almost identical to Shreve's but on a replacement basis. Because Schaaf's application for a permanent position was still on file, and because she had discussed the matter with Hurlburt, the District was on notice at this time that Schaaf was interested in any vacancy which might appear on the elementary level.

19. Several days before April 30, when he received a copy himself, Assistant Superintendent Hurlburt learned of Shreve's letter of resignation through Principal Haney, who expressed to Hurlburt his desire to replace Shreve with a teacher strong in social studies inasmuch as that would have been Shreve's chosen department the next year, had he not resigned. Hurlburt immediately, prior to April 30, contacted one person, Kurt Anthony, a male applicant with whom Hurlburt was familiar from having watched him play high school basketball several years earlier, when Hurlburt was a coach for the District. Hurlburt had also had several calls from his brother in law recommending Anthony and the court concludes that the selection was on a personal basis. At Hurlburt's request Anthony came to the central office on April 30 for interviews with Hurlburt and Superintendent Gregg before being introduced to Principal Haney; later that day Anthony was introduced to several of the faculty, including fifth grade teachers John Shreve, Mary Schaaf, and Candace Edmonds, as a candidate for Shreve's position. At the time Anthony was interviewed for Shreve's position, the vacancy had not been posted, as required in the contractual agreement between the District and the teachers' association, for the purpose of permitting the District's current professional staff the first opportunity to apply for the position.

20. After learning on April 30 that Anthony was being considered to replace Shreve still prior to posting of notice of the vacancy, Mary Schaaf on May 2, 1975, went to see Principal Haney and inquired of him about her status as an applicant for the same opening. The testimony as to what transpired at this conference is in dispute. Schaaf says that Haney told her that he wanted a male teacher to replace Shreve and that if he had his way he would replace all of his female teachers at the Middle School with men and that therefore she was not being considered for the position. Haney denies this and the court makes no finding with respect to this matter inasmuch as this is a question as to whether plaintiff has carried her burden of proof. We do find however that as was admitted by Haney that he did say "the Middle School should have additional men teachers". (page 254)[1]

21. On May 5, 1975, after an earlier appointment had been cancelled and rescheduled at the request of Dr. Hurlburt, Ms. Schaaf met with Assistant Superintendent Hurlburt to discuss her candidacy for the Shreve position. Again, what was said at this conference is sharply in dispute and since plaintiff had the burden of proof, the court makes no finding with respect to exactly what was said. The court does find however as admitted by Assistant Superintendent Hurlburt that there was discussion of sex discrimination and that Ms. Schaaf reported to Hurlburt what she claimed Haney had told her relative to females in the Middle School. Hurlburt does admit that there was discussion as to the male-female

---

1. The court notes an inconsistency between Haney's testimony at page 262–263 that there were 15 male teachers at the Middle School and Finding of Fact 5, being response to plaintiff's request for admission which states there were 11 male teachers at this school.

**1374**

ratio at the Middle School (page 218) and that there were more females on the Middle School staff than there were males.

22. After her meeting with Hurlburt, Schaaf contacted Carl McGary, the local representative of the Pennsylvania State Education Association (PSEA), a statewide teachers' association which represents teachers in negotiating grievances and securing contractual agreements with local school districts. She related her alleged conversations with Hurlburt and Haney to McGary and asked him to speak to Hurlburt in her behalf against what she felt was hiring irregularity.

23. Soon thereafter, Hurlburt came to McGary's classroom at McGary's request to discuss Schaaf's application. In their discussion McGary stressed the superior qualifications of a properly certified elementary teacher with two years of experience over an inexperienced teacher right out of college. The two also discussed "the advantages and disadvantages of having men in elementary teaching positions." Then, in the words of Dr. Hurlburt, "We talked about qualifications, we also talked about the fact at this time that I knew at that time there were more women in the Middle School than there were men." Hurlburt concluded by stating, "Carl, you know we need a man in the Middle School," to which McGary replied that whatever Hurlburt did he should not make sex the basis for the selection or the District would be inviting a charge of discrimination. Hurlburt denies making this specific remark to McGary, but the court finds McGary's version of the conversation as correct.

24. McGary reported back to Schaaf his conversation with Hurlburt and recommended that she seek the assistance of the regional office of the PSEA, which she did by phoning Donald Creola, representative for the Northwest Pennsylvania Area of PSEA. Creola assisted Schaaf by mailing her the forms for filing a complaint with the Equal Employment Opportunity Commission, and he attempted to depose John Shreve, but was unable to do so because of Mr. Shreve's move to Florida.

25. When John Shreve tendered his letter of resignation to Dr. Hurlburt personally on April 28, 1975, Dr. Hurlburt first expressed his sorrow to see Shreve go and his gratitude for his service, and then told Shreve that his early notice would allow the District time to find a qualified replacement. Shreve, in answering several questions by counsel concerning this conversation, testified that Hurlburt told him that he either "intended to", or "wanted to", or "would like to", or "was going to" hire a man or was "looking for" a man to replace Shreve, giving Shreve the impression that the District wanted to replace a male teacher with a male teacher.

26. Shreve related to Schaaf his conversation with Hurlburt and Hurlburt's statement preferring a male replacement. He related the same story to the EEOC person investigating Schaaf's charge of sex discrimination in November, 1975, to Hurlburt himself in a phone conversation on December 12, 1976, and in his deposition the next day.

27. By appointment Schaaf met with Dr. Gregg in his office around May 14 to inform him of the situation. She related to Gregg that a male was being interviewed and considered for the Middle School vacancy but that she was not, despite her having experience and the male having none. She also told Gregg about the statements indicating a male preference made by Haney and Hurlburt. Gregg testified that, like Hurlburt, he put no credence in Schaaf's allegation, but neither the Superintendent nor the assistant superintendent questioned Haney about Schaaf's allegation until January 1976, after notice of the charge had been received from EEOC.

28. On May 19, 1975, at a meeting of the District School Board, with the recommendations of Hurlburt and Haney, Gregg recommended Kurt Anthony for the fifth-grade vacancy at the Middle School, and the School Board awarded him a teaching contract.

29. In August 1975 the District notified Schaaf of a first grade vacancy at the Dis-

trict's Central Elementary School for which she would be considered if she were interviewed. She arranged a date and was interviewed by two of the District's elementary principals, who at the conclusion told her she would be notified of their decision. She later received a letter from the District saying another candidate had been selected. The person hired was Judith Pasold, at a $7600 salary; she had no teaching experience. Hurlburt testified that the fact that Pasold was the head of a household having six children was taken into consideration in the selection.

30. Mary Schaaf began teaching the fourth grade at the private Erie Day School in Erie in September 1975. For 1975–76 her salary was $6000; for 1976–77 her salary is $6500.

31. The annual salary scale for Mrs. Schaaf when she replaced Mrs. Thayer from February through June 1975 was eight thousand and some odd dollars. If Mrs. Schaaf had been hired by the District for 1975–76, her salary would have been $9020.50; for 1976–77 her salary would have been $10,229, representing a step increase of one year, as well as a $900 increase in the whole scale.

32. By hiring Anthony instead of Schaaf, the District saved $1620.50 in salary payments; Schaaf would have received more because of her two years of experience in the District. The District saved the same amount for the same reason when it hired Judith Pasold instead of Schaaf.

33. By comparing objective criteria, Mary Schaaf was in 1975 a more qualified teacher applicant than Kurt Anthony. With a Bachelor of Science in Elementary Education and a Pennsylvania Provisional Collegiate Teaching Certificate. Schaaf had two and one half years teaching experience in the District, including one half year teaching the very grade level which was sought (grade 5), and teaching at that level two separate sections of the very course where the specialization was desired (social studies). Anthony had no teaching experience. Schaaf's college quality point aver-

age was 3.46 on a 4.0 scale, with an "A" in student teaching. In the social studies area she received "B's" in American Government, U.S. and World Civilization, and Earth Science, and an "A" in Geography. Her undergraduate grades include nothing below her one "C", in physical education, plus 22 "A's" and 26 "B's." Kurt Anthony's quality point average was 2.57 on a 4.0 scale. In the social studies area he had no "A's," four "B's," four "C's," and two "D's." His total grades include five "A's," twelve "B's," twenty-three "C's," three "D's," and one "F," economics.

34. Although opportunities for observing and criticizing Mary Schaaf in the classroom were extensive over her two and a half years of teaching in the District (such evaluations are required by state law, and in fact, the Assistant Superintendent and her principal each observed her three times in the spring of 1975), nothing but favorable evaluations were made of her during her tenure. Prior to the trial the District had nothing but approval and praise for Mrs. Schaaf's performance.

35. Dr. Hurlburt's recollection that Mrs. Schaaf expressed to him no interest in supervising athletics at the elementary level if she were hired is repudiated by Mrs. Schaaf's two completed applications for employment, where, under the paragraph entitled "With what extra curricular activities can you help—List in order of preference:" she listed on the February 1974 form "sports" and on the May 1975 form "girls' sports." Schaaf's interest in supervising sports is more accurately set forth in her two teacher applications than in Hurlburt's recollection. Inasmuch as the Assistant Superintendent testified that at the elementary level a teacher's interest in supervising children in extracurricular activities such as athletics is qualification enough for such an assignment, that no great ability in the particular sport is necessary, Mary Schaaf, by her expression of interest to help in this area, was sufficiently qualified to supervise elementary athletic activities. No certificate for coaching is required.

## DISCUSSION

The burdens assumed by the court in sex discrimination cases involving educational institutions and school districts have become increasingly heavy since the adoption of the 1972 amendments to Title VII of the Civil Rights Act of 1964 making the Act applicable to educational institutions and school districts. This has become such a fertile field of litigation that considering the volume and complexity of cases in this court alone, the court wonders whether defendants in general are making good faith attempts to comply with the act or whether it is regarded as merely an additional bureaucratic burden to which as much lip service is given as is necessary for appearances' sake.

42 U.S.C. § 2000e-2(a)(1) and (2) provide:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Under 2000e-5 provision is made for suit by the Attorney General who may bring a civil action against the respondent in the appropriate U.S. District Court. Provision is also made for suit by the person aggrieved. In 42 U.S.C. § 2000e-5(g) various remedies are provided in case the court finds that the respondent has intentionally engaged in any unlawful employment practice. In the last sentence, however, of subparagraph (g), it is provided:

"No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.

When the court has to deal with cases of this kind, it has specific instructions to follow which have been enunciated by the U.S. Supreme Court with respect to Title VII cases. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) a racial discrimination case claiming a refusal to hire a black employee who has been engaged in a stall in on a highway leading to the plant, the court pointed out:

"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.

"What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

(Quoting from *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The court further stated:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the

employer continued to seek applicants from persons of complainant's qualifications. In the instant case, we agree with the court of appeals that respondent proved a prima facie case. Petitioner sought mechanics, respondent's trade, and continued to do so after respondent's rejection. Petitioner, moreover, does not dispute respondent's qualifications and acknowledges that his past work performance in petitioner's employ was 'satisfactory.' "

The court then pointed out 411 U.S. at page 804, 93 S.Ct. at page 1825, 36 L.Ed.2d at page 679;

"On remand, respondent must, as the court of appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall in' were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races."

*McDonnell Douglas* was then remanded to the court below for further consideration in view of the fact that there was nothing in the act which compelled an employer to rehire one who had engaged in deliberate unlawful activity against it.

While *McDonnell Douglas* was a race discrimination case, the same guidelines are equally applicable to a sex discrimination case which also falls within the provisions of Title VII.

Our own circuit in *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3d Cir. 1976) had this to say:

"The court cited *McDonnell Douglas Corp. v. Green,* supra and carefully followed its guidelines in ruling on burden of proof at various stages of the case. The *McDonnell* case holds that once a prima facie case of a Title VII violation has been established, the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the unequal treatment shown in the prima facie case. The defendant must prove its justification by a preponderance of the evidence."

The course of procedure required by *McDonnell Douglas* was therefore followed in this case. At the conclusion of the plaintiff's case the court ruled that plaintiff had made out a prima facie case because of the evidence that plaintiff had a high academic background, that her performance had been rated satisfactory by numerous persons including the county and district superintendents and the principal of her school and nevertheless when she applied for this position in the Middle School Wattsburg School District she was told that the school district wanted a male to fill the vacancy occasioned by the resignation of Mr. Shreve. The Assistant Superintendent indicated that he also felt that a woman could not handle the discipline and wanted somebody strong in social studies. Later there was a claim that they wanted a teacher able to coach boys and girls athletics in this school comprising grades 4 through 8.

The court makes no finding with respect to the alleged remark by principal Haney to the effect that he stated there were too many women in the elementary school and he wished he could get rid of all the women, because the evidence on this point is evenly balanced.

The court finds, however, that male sex was considered as a qualification of this job by virtue of the testimony of Mr. McGary the teacher's association representative who conferred with Mr. Hurlburt about the situation and warned Hurlburt that in view of his statements the district might get into a sex discrimination case. While this was denied by Hurlburt, nevertheless the court finds that McGary is a disinterested witness under the circumstances and therefore finds that the conversation did take place as recited by McGary. (Page 75).

A further factor in the situation is the failure to give fair consideration to plaintiff's qualifications. It is obvious, of course, that this court does not possess the

expertise to appraise the qualifications of those in the teaching profession whether they be university professors or elementary school teachers. See *Faro v. New York University,* 502 F.2d 1229 (2d Cir. 1974). But when allegedly superior qualifications are set up as the reason for discharge or refusal to hire the court does have the right to insist under 2000e-2(a)(1) and (2) that fair consideration be given to the qualifications of the female applicant. See *King v. New Hampshire Department of Resources,* 420 F.Supp. 1317 at 1327 (D.N.H.1976) wherein the court said:

"Defendant's claim that the job was given to an applicant with superior qualifications does not, by itself, relieve it of the necessity of showing that it did, indeed, give the plaintiff fair consideration. The alleged fact that defendant hired a superior applicant may well be some evidence of the defendant's good faith consideration of plaintiff; however, the defendant here did not give the plaintiff fair consideration. The court in *Pond v. Braniff Airways, Inc.,* 500 F.2d 161, 165–166 (5th Cir. 1974), stated:

'Of course it is true, as urged by *Braniff,* that where an employer can demonstrate no discrimination in the selection or advancement of employees, but rather that the employer in the best of faith merely weighed each person's talents then choosing the man over the woman (or the woman over the man), no case is made out under Title VII. But the inquiry does not necessarily stop here. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a female applicant are not simply a ruse disguising true discrimination.'

\* \* \* \* \* \*

"Here, I find no such good faith. I find that the defendant exhibited a discriminatory animus toward plaintiff and that his articulated reasons served merely as a cover for the discrimination which occurred at the consideration stage.

"Therefore, I find that, in 1974 and 1975, defendant discriminated against

plaintiff on the basis of her sex. I further find that, in 1976, defendant met his burden of articulating legitimate reasons for not hiring plaintiff. In 1976, plaintiff's veracity and trustworthiness were challenged by her failure to disclose her less than favorable employment experience at the local bank, giving defendant legitimate grounds for rejecting her application."

■ The plain facts in this case show that the administrators of the defendant school district had already decided to hire Mr. Anthony when they interviewed Mary Schaaf for this position. The facts clearly show that Mr. Shreve had resigned on April 28, 1975 (defendant's Exhibit 3), that assistant superintendent Hurlburt knew about this on April 30, that Mr. Anthony had already been selected and was introduced to the faculty at the Middle School on May 2, before the job was posted. The job was not posted until May 6, 1975 (Deft's Ex 4) and Ms. Schaaf was interviewed thereafter. Principal Haney had already determined that he wanted a male for this position one who was strong in social studies. It was later stated that there was a need for someone to coach athletics.

The court determines that while there is testimony that Ms. Schaaf was a poor teacher and that Anthony's qualifications for social studies were much better than hers the court finds that this is pretextual and these are reasons now advanced by the defendants to justify a position which had already been decided with sex animus involved before any consideration was given to Ms. Schaaf or her qualifications. With respect to her qualifications and her strength in social studies, it appears that she had Bs in college in American Government, U.S. and World Civilization and Earth Sciences and an A in Geography. Anthony's transcript (D Ex 10) on the other hand shows C in World Geography, C in World Civilization, B in Cultural Geography, and a B and a C in U.S. History. His transcript also shows that he failed economics and received a D in American Government. Overall Ms. Schaaf as noted had a

rank of 8 in a class of 131 and her educational qualifications were thus superior to Anthony's. Further the evaluations of her teachings never surfaced as unsatisfactory until this controversy arose, the previous ratings for several years being satisfactory. As stated the court is not the one to make these determinations, but we do have the right to insist these determinations be made in the spirit of fair consideration and not for the purpose of developing a pretext to support a decision already made based upon sex.

The court has further considered the case of *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972) wherein the court said "any form of discrimination in employment opportunities based upon race, color, religion, sex or national origin can no longer be tolerated". In *U. S. v. N. L. Industries,* 479 F.2d 354 (8th Cir. 1973) in addition to holding that discrimination may be shown by statistics, it was specifically held that avoidance of expense was not a proper reason (which is one of the reasons advanced here, that the school district could get Anthony without any experience at lower rate of pay) and the court has also considered *Long v. Ford Motor Co.,* 496 F.2d 500 (6 Cir. 1974) holding that "schemes of discrimination whether blatant or subtle are forbidden."

In the light of the foregoing, the court concludes that the hiring of Anthony, a male, in place of Ms. Schaaf was a discrimination in hiring based upon sex, that fair consideration was not given to Ms. Schaaf's application and qualifications and that the hiring of Anthony was to a large extent based upon the desire to secure a male teacher in the elementary schools and that the testimony with respect to his superior qualifications is pretextual.

### CONCLUSIONS OF LAW

(1) This court has jurisdiction of the parties and of the subject matter.

(2) The defendant Wattsburg Area School District and its Superintendent William J. Gregg and the other members of the school administration have engaged in discrimination against Mary Schaaf in connection with her application for a position as teacher in the Wattsburg Area Middle School and discrimination because of her sex.

(3) The defendants have failed to give fair consideration to the application of Mary Schaaf for a position as teacher in the Middle School Wattsburg Area School District because of previous decisions based upon sex bias to hire Mr. Anthony.

(4) The court should enter an order directing that the defendant school district pay to Mary Schaaf such back pay as she may be legally entitled to as the result of the unlawful employment practices determined to have been engaged in by the defendant school district and the said school district shall also employ said Mary Schaaf as a teacher in the Wattsburg Area Middle School at such time as may be later determined by the court.

(5) The cost of this proceeding should be paid by the defendants.