**Doris M. WATSON, Plaintiff,**

v.

**MAGEE WOMEN'S HOSPITAL, Defendant.**

**Civ. A. No. 76–1136.**

United States District Court,
W. D. Pennsylvania.

May 30, 1979.

William S. Hays, Pittsburgh, Pa., for plaintiff.

Robert H. Shoop, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

OPINION

COHILL, District Judge.

Plaintiff Doris Watson filed this employment discrimination suit under Title VII, 42 U.S.C. § 2000e–5, alleging that the defendant, Magee Women's Hospital, discharged her "due to discrimination against [her] because of her sex." She requested damages and attorney's fees. All jurisdictional prerequisites to federal suit had been met.

After four days of trial, this Court must determine whether Plaintiff Watson's claim of discrimination has been proved. At the close of plaintiff's case, the defendant moved to dismiss the case, alleging that the plaintiff failed to meet her burden of proof in establishing a prima facie case of discrimination. We construed that motion as a motion for a directed verdict under Rule 50 and took it under advisement, directing the defendant to go forward with its proof. The case is now ripe for decision on the merits.

## I. *Findings of Fact*

In August of 1957, Plaintiff Doris Watson was hired by Dr. Paul Taylor to work as a laboratory technician under his direction doing pediatric research at Magee Women's Hospital. She was discharged in June of 1973, after almost sixteen years on the job.

For most of this time, the laboratory in which plaintiff worked was located on the premises of Magee Women's Hospital. For a short period of time in the early 1960's the pediatric lab moved to nearby Children's Hospital; however, it has been constantly at Magee since 1962, and even while work was being conducted at Children's Hospital, certain other of the lab work continued at Magee.

At the time she began her employment at Magee plaintiff's salary was paid by the "25 Club," a group funding infant research. Sometime shortly thereafter she began to be paid by the defendant hospital; the defendant's personnel director, John H. McKrell, testified that she was treated as an employee of the hospital, subject to its policies for management level employees.

Dr. Taylor was plaintiff's supervisor from 1958 to 1973, except for two periods of about one year each when he was working abroad. The first of these periods occurred from summer, 1959 to summer, 1960; the second from mid-1971 to mid-1972. Plaintiff testified that Dr. Taylor hired an additional technician in 1962, a woman named Gail, who left after about one year; Dr. Taylor then hired one Viera Watterman, another woman, who worked in the lab from 1963 to 1969; while Mrs. Watterman and plaintiff were both there, Dr. Taylor hired Julia Pitcavage who worked at the lab for three or four years. For a time, then, Dr. Taylor had three female assistants in his lab. About 1969, Betty Steranko was hired. Mrs. Steranko, like Mrs. Watterman, had young children at home. In 1970, Peggy Harper was hired and worked only a short while. For the last two or three years of plaintiff's employment with defendant, she and Mrs. Steranko were the two technicians in the lab, and Mrs. Steranko alone remained after plaintiff was discharged, no one ever having been hired to replace the plaintiff.

From 1959 to 1973, *every* full-time lab technician hired by Dr. Taylor for plaintiff's lab was female.

Plaintiff had a very responsible position in the pediatric laboratory and testimony and exhibits both indicate that she contributed substantially to pediatric research over the years. She also taught lab procedures to new doctors who had no experience in animal surgery. In an employment evaluation, Dr. Taylor once described her performance as "excellent—our standard setter in the lab."

The primary research project in this lab involved experiments on premature lambs which were removed from sheep's wombs and then kept alive and tested. Each lamb experiment required a full day of concentrated effort by the staff, often without time for breaks or meals. Because of nature's cycle, the "lambing" season being from December to April, these experiments were concentrated in the spring months. These experiments were intended to uncover respiratory and renal problems which were often causes of neonatal deaths in human babies. During 1972 and 1973, experiments were conducted on two or three lambs per week during the season. Work on these days was arduous and fast-paced.

During other times of the year, the laboratory conducted other animal experiments and compiled materials for publication.

Letters between plaintiff and Dr. Taylor while Dr. Taylor was abroad, submitted into evidence, demonstrate that the two had had a close working relationship for many years. They also show that each had a deep concern for the other's well-being and family life. In the few years preceding 1973, plaintiff had many personal problems. She was separated and divorced from her husband of twenty years during this time; she had four children in the teen years; her mother died sometime in 1971 or 1972. For many years she had been plagued with health problems. She testified that she had had rheumatoid arthritis since she was a

teenager; that she had been hospitalized with mononucleosis in 1960 or 1961; that she had experienced a nervous breakdown; that she developed high-blood pressure sometime during her years at Magee and that she was diagnosed as having hypoglycemia in the early 1970s.

In addition to her personal difficulties, things at work became hard for her after Dr. Taylor left for Switzerland in 1971. During that time Dr. Alexander C. Allen was in charge of the lab, and a Dr. Dora Stinson also was involved in the work being done there. Whatever the origins of their disputes, it is clear that plaintiff did not get along with Doctors Allen and Stinson as well as she had with Dr. Taylor. Dr. Allen testified by deposition that from what he had heard about plaintiff's work when he joined the lab, she had functioned well in the past; however, her performance deteriorated in the last two years she was at Magee. She was disorganized and sloppy in running the lab and generally inefficient (T.17–20). Dr. Allen also testified that she could not adapt to new methods and techniques and that she disagreed with the doctors on how to accomplish certain procedures. (T.13–14) This was corroborated to some extent by plaintiff's testimony that she had a dispute with Dr. Stinson over an "EM" machine and that she felt Dr. Stinson wanted results too fast in order to publish research papers. In her letters to Dr. Taylor, plaintiff declared that she was "so fed up with Dr. Allen" that she had become "a robot" on the job and that Donna [Dr. Allen's secretary] was "a scheming female who can lie and turn on and off the tears at will" [Defendant's Exh. B], that she was "on the verge of exhaustion" [Defendant's Exh. C], and that she might not still be at work at Magee when Dr. Taylor returned from Europe [Defendant's Exh. A and B]. Dr. Taylor's replies attempted to reassure plaintiff, telling her to "Hold tight! You only have 10 months to wait until the lab gets noisy and thoroughly messed up again . . . you are much in the center of my planning" [Plaintiff's Exh. 18] and that "the pressure will ease up once I return . . . I need you and Betty" [Plaintiff's Exh. 20].

Ronald Dean, an EEOC compliance officer who investigated plaintiff's charge, testified that his investigation revealed that Dr. Stinson and plaintiff could not get along.

Plaintiff's two children, Janette Blair and Kent Watson, both of whom worked in the hospital as student assistants, testified that their mother worked long hours, often without breaks. During the lamb season, she would arrive at the hospital between 7:30 and 8:00 A.M. and would not leave until 5:30 or 6:00 P.M. The drive to and from home took over an hour. She was frequently very tired after work during 1971 and 1972.

Plaintiff stated that she did not believe her health problems were aggravated by her work at the lab but rather by the lack of help and long hours without breaks.

Dr. Paul Taylor testified that after he returned to the hospital in 1972, he began a series of weekly meetings with Doctors Allen and Stinson who continued to work at the pediatric lab. Both complained about plaintiff's work, and felt that the lab would run better with only Mrs. Steranko as technician. Dr. Taylor did not suspend or discipline plaintiff in any way; however, he testified that he felt he had made it clear to her in informal discussions that her work was unsatisfactory. Sometime in late 1972, Dr. Taylor determined that plaintiff would have to be terminated; he testified in court that this was not an easy decision, since he had known plaintiff personally for many years. He also felt that the work situation was stressful for her, that the long drive to and from work was taxing on her, and that she continued to have many family pressures. He saw her health as deteriorating while work at the lab remained demanding and urgent. Dr. Taylor never documented these problems; instead he looked for a way to terminate her.

In April of 1973, plaintiff became ill and was hospitalized. On April 20, Dr. Taylor came to visit her in the hospital. Although her physician, Dr. Cammarata, had told her

she could return to work if she improved, Dr. Taylor discouraged her from returning. He suggested she resign from her job because of her deteriorating health. When plaintiff refused to resign, Dr. Taylor soon terminated her.

Her personnel records show she "resigned" due to health problems.

Doctors Allen and Stinson continued to work in the lab until 1975. Mrs. Steranko stayed on, working as the only lab technician after plaintiff's discharge, and the lab operated for four years without anyone filling plaintiff's previous position.

In support of her sex discrimination claim, plaintiff testified that Dr. Taylor had felt that women with children should be home and not working during the day. She stated that Mrs. Steranko was a "submissive" woman and took summers off to be with her children. She also stated that she and Dr. Taylor argued about the issue of abortion. At the trial Dr. Taylor was not questioned on these subjects. It was established by the evidence that from 1957 to 1973, Dr. Taylor hired at least six full-time female assistants; he testified that he hired only one male, John Henderson, with the understanding from the outset that it would be for a limited term of nine months. Of the six females employed by Dr. Taylor, at least three of them had young children at home.

Plaintiff asserted that her discharge constituted sex discrimination because the hospital deviated from its usual procedures used in discharging her—procedures that were routinely followed in discharging males.

John McKrell, defendant's personnel director, was questioned by plaintiff as to the procedures used in discharging employees. McKrell testified that hospital policy requires that a disciplinary suspension be given to an employee prior to termination, and that since 1976, written warnings have been required prior to termination. Before 1976 —including 1973, when plaintiff was terminated—verbal warnings alone might have been given.

He was questioned by plaintiff as to discharge of numerous male employees in 1971, 1972, and 1973.

James T. was an employee in the housekeeping department from Sept. 30, 1970 to Feb. 4, 1971; his records showed he was warned several times about absenteeism and counselled twice before he was terminated. The policy of requiring a suspension prior to final termination was not followed in his case.

Elroy H., employed in housekeeping and maintenance from August 22, 1959 to January 8, 1971, was warned verbally and in writing of his drinking problem. He was also demoted and suspended at least twice prior to discharge.

Albert C. was shown in the records kept by Mr. McKrell to have been demoted for lack of supervisory ability; however, McKrell testified that he was a working foreman in the bargaining unit—"hardly supervision." Functionally, he was in charge of two or three other employees in the maintenance department. He was suspended once and demoted once prior to being terminated on December 3, 1973.

Thomas E. was employed as an orderly from Oct. 5, 1970 until Sept. 1, 1971. McKrell found two written warnings in his file prior to his discharge. However, the policy of suspending an employee prior to discharge was not followed in his case.

James McD., also an orderly, was hired Aug. 4, 1969, and his records note two written warnings before his discharge on June 29, 1971. Again the required suspension was not given.

Donald T., employed from February 15, 1972 to May 2, 1973, received one written warning and one suspension. After he failed to show up at work for a period of 72 hours, he was sent a letter of termination.

Lonnie G. was hired March 29, 1972, and fired April 23, 1973 for insubordination; he received two warnings but no suspensions prior to discharge.

Robert Z. worked at the hospital for an unspecified period of time; he was warned twice before he was discharged for absenteeism.

Daniel DeA.'s rather lengthy records indicated that he had been given at least three written warnings and one suspension prior to discharge.

Robert B., employed June 12, 1969 to June 10, 1971, had five anecdotal notes of warning—but no suspension—in his file prior to being discharged for cause.

McKrell stated that most of these were non-supervisory employees within the hospital, all working for departments under the direct supervision of the hospital administration. None of them had positions similar to plaintiff's; she was considered management or "exempt"—*i. e.,* exempt from the minimum wage laws as a supervisor—and she was supervised by Dr. Taylor who was not an employee of Magee.

## II. *Discussion and Conclusions of Law*

There is no dispute in this case that the plaintiff was involuntarily terminated from her employment. The question in issue is whether a sexually discriminatory employment action was taken by the defendants. In reviewing the evidence submitted in support of a charge of sex discrimination a federal court, unlike the EEOC, which acts pursuant to its own regulations and standards, is bound by Title VII of the Civil Rights Act of 1964 and the federal cases decided thereunder.

In 1973, the United States Supreme Court set down guidelines for deciding suits under Title VII. In the oft-cited case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668, a unanimous court wrote:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination.

.    .    .    .    .

The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection.

.    .    .    .    .

[If defendant's] reason for rejection thus suffices to meet the prima facie case, . . . [plaintiff must] be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext."

That case involved a claim by a black male that he was denied employment on the basis of his race. To meet his burden of establishing a prima facie case, the Court wrote:

"This *may* be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

411 U.S. at 802, 93 S.Ct. at 1824 (emphasis added).

These formulae by the Supreme Court have been quoted in literally hundreds of circuit court and district court cases, *see* cases collected at 42 U.S.C.A. § 2000e–5, n. 282 (1974) and Supp. Pamphlet (1974–78), and both have been offered by defendant here.

We accept as dogmatic at this time the order of proof, or "phases," necessary in a Title VII trial: plaintiff must first establish a prima facie case of discrimination before the burden of proof shifts to defendant to show valid reasons for its apparently discriminatory actions; plaintiff must then be given an opportunity to demonstrate that defendant's reasons are pretextual. *See Whack v. Peabody & Wind Engineering Co.,* 595 F.2d 190 (3d Cir. 1979).

■ What must be shown to establish a prima facie case is less clear. Although the Supreme Court pronouncement in *McDonnell Douglas* is often cited, it was intended only as one way that a case *might* be established and applies on its face only to a case of alleged refusal to hire. The Court explained in a footnote: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing fac-

tual situations." 411 U.S. at 677, n. 13, 93 S.Ct. at 1824, n. 13. We find that the specific four-step procedure by which a prima facie case of refusal to hire a member of a racial minority might be proven is inapplicable here. Drawing on the general language of *McDonnell Douglas* and several subsequent, well-reasoned cases, we hold that the plaintiff must establish three elements: (1) that she is a member of a protected class; (2) that she was the object of adverse employment action; and (3) that there was a causal relationship between her membership in the protected class and the adverse action which she suffered. *See, Rivers v. Westinghouse Elec. Corp.,* 451 F.Supp. 44 (E.D.Pa.1978); *Pearson v. Borden Metals Products Co.,* 434 F.Supp. 840 (D.C.Ala.1977); *Detroit Police Officers Ass'n. v. Young,* 446 F.Supp. 979 (E.D.Mich. 1978). These three elements must be established before the burden shifts to the defendant, or in this case, where defendant has moved for a directed verdict, to withstand that motion.

█ It is apparent that plaintiff is a member of a protected class—females—and it has been established that she was involuntarily terminated. It is the last essential element—proving that her sex was *the* reason, or *a* reason for her termination—that is the most difficult and elusive element of her burdens of proof. In oral argument during the trial, plaintiff's counsel noted the difficulty in proving the reason for an employment decision and suggested that facts need only be proved from which an inference of discrimination could be drawn. We agree that most discrimination cases must be proved by inferences drawn from direct and circumstantial evidence; few, if any, employers would note in an employee's personnel record that the employee was fired because of race or sex. However, the

inferences drawn from the evidence establish must logically point to invidious discrimination, for it is only such discrimination that is prohibited under Title VII. *McDonnell Douglas, supra,* 411 U.S. 800–02, 93 S.Ct. 1817. That an employment decision is unfortunate for the employee, unwarranted, unkind, or even unprincipled is not enough—at least, not enough to support a Title VII action.[1] To permit such an action to succeed, without clear proof of a link between the plaintiff's protected status and the adverse employment decision, would cause Title VII to become a vehicle for providing compensation following an adverse employment decision to every person in a protected class—that is, to every citizen of either sex, any race, origin or nationality. Although *all* citizens are protected under Title VII, they are protected only against the specific harm of invidiously discriminatory preference by employers. As the Supreme Court noted in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971):

> "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a number of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.
>
> What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

Establishing this specific link may be done in any way that demonstrates the

---

1. See the opinion of Chief Judge Weber of our district court in *Lomard v. School District of Erie, Pa.,* 19 FEP 72, 75 (W.D.Pa.1978), in which he wrote:

   "We stress that, to avoid Title VII liability, the defendant need only articulate the reason for the apparently unequal treatment that is not sex related and need not state that the selection was based upon merit. Stating that a man was selected over a woman for a job because a man had more friends in high places constitutes a 'non-discriminatory reason' for the unequal treatment sufficient to avoid liability under Title VII even though such hiring practices may violate other laws."

actual or probable existence of the racial, sexual or otherwise-invidious motivation of the employer. A review of existing case law shows several common methods of meeting plaintiff's burdens of proof.

In some cases discriminatory motive is closer to the surface than in others, or the difference in qualifications of competing applicants is so obvious as to raise a question as to motive. In *United States v. Wattsburg Area School Dist.,* 429 F.Supp. 1370 (W.D.Pa.1977), a case brought in our district court, a plaintiff was able to prove through several witnesses' testimony that her employer had expressed a desire to hire a male teacher for a middle school position. She also proved that her qualifications for the position were markedly superior in her academic performance, student teaching, and actual experience to those of the male who was hired for the position. On these facts, Judge William Knox concluded that sufficient sex animus was demonstrated to establish a prima facie case. *See also Rogillio v. Diamond Shamrock Chemical Co.,* 446 F.Supp. 423 (S.D.Tex.1977) (proof of superior objective qualifications of female lifeguard over those of male who was hired made out a prima facie case). In the case before us, the only proof plaintiff has offered that would remotely suggest a discriminatory motive or bias against females was her testimony that she and Dr. Taylor differed on the subject of abortion and that Dr. Taylor believed women with children should not work. Dr. Taylor was not asked about these matters, but accepting plaintiff's testimony as true, any theoretical opinions of Dr. Taylor are, of course, protected by the First Amendment to our Constitution, so long as those opinions would not be implemented in a way that discriminated against women as a class. Common sense prevents the conclusion that opinions expressed by men favoring or disapproving abortion display a general bias against women when women themselves are divided on this issue.

Plaintiff's suggestion that Dr. Taylor believed women with children should not work may be true; however, any inference that he enforced such a belief among his employees is overcome by the plaintiff's own testimony that he hired several women with young children, including Mrs. Watterman, Mrs. Steranko, and the plaintiff herself who had four children under the age of six when she was first hired.

Moreover, although plaintiff's work was exemplary for many years, she has not proved that her qualifications were superior to those of any employees who were kept on when she was let go. Neither has she shown that she was displaced or replaced by a member of the opposite sex. In fact, no one replaced her and the laboratory from which she was discharged continued to operate with only her former co-employee— another female.

■ Another method of establishing a plaintiff's case is proving disparate treatment between the plaintiff and members of the other class. This is normally accomplished by showing specific examples in which members of the different sexes or races have been treated disparately, or by demonstrating disparate treatment through statistics. A total absence or very nominal number of members of the protected class in a work force constitutes a permissible basis for inferring existence of unlawful discrimination. *Badillo v. Dallas County Community Action Committee, Inc.,* 394 F.Supp. 694 (D.Tex.1975); *EEOC v. Local 14, Int'l Union of Operating Engineers,* 553 F.2d 251 (2d Cir. 1977).

The Supreme Court has held that "gross statistical disparities" alone may, in certain cases, constitute prima facie proof. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In a case tried in this district, a plaintiff suing the University of Pittsburgh School of Medicine for an alleged sexually-motivated denial of tenure presented statistics showing, *inter alia,* that of 401 faculty members in the school only 5 women had tenure; that 70 men had been given tenure as compared to 3 women in the six years preceding suit; that there were four times as many women eligible for tenure as men; that 45% of men in the tenure stream

achieve that goal, but only 6% of the women; and that the average salary for tenured male professors was over $10,000 more than the average for females. On these facts, a prima facie case was established. *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328 (W.D.Pa.1977). *See also Ostapowicz v. Johnson Bronze Co.,* 369 F.Supp. 522, 532 (W.D.Pa.1973). Of course, statistics may not always be dramatic; they must, however, support a plaintiff's claim where she or he relies on such proof.

In this case, plaintiff's testimony about the sexual composition of employees tended to refute her claim. She stated that all the full-time technicians in her lab were female and almost all the lab technicians she had ever come in contact with at the hospital had been female.

She relied heavily on examples of the procedures used in discharging employees, arguing that these procedures were applied differently in her case, that of a woman being discharged, than they had been applied in cases of men being discharged. This kind of evidence may properly be used to establish a pattern of disparate treatment or to show that a facially neutral policy of an employer has a disparate impact on a certain class of employees. This latter proof—disparate impact—may alone be a valid way of establishing a prima facie case. *See Kirkland v. New York State Dept. of Correctional Services,* 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), *reh. denied,* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1976), where Judge Van Graafeiland wrote:

> "Proof in employment discrimination cases proceeds from effect to cause. Plaintiffs establish the . . . disparate consequences of defendant's employment practices, and defendants must then justify such consequences on constitutionally acceptable grounds."

Plaintiff's proof at least established that the policies articulated by the defendant were not followed systematically. In the specific cases cited by plaintiff, where men were discharged, some of the men received one warning; some two or three or more; some were suspended; some were not. Although the defendant's personnel director testified that it was a hospital policy to suspend non-supervisory employees before finally terminating them, this policy was not consistently followed in the cases of the men whom the plaintiff brought to our attention. Moreover, almost all of these employees functioned in non-skilled jobs, unlike plaintiff's position, and most of them worked at the hospital for less than two years.

Of course, since almost all of the employees in plaintiff's job category were also female, she could not establish disparate treatment by comparing their discharges against her own. But the fact that females were hired almost exclusively for this category militates strongly against a claim that the employer practiced sex discrimination—at least such a claim brought by a female.

One male who was a foreman in the maintenance department and was listed by the hospital as a supervisor for some purposes, similar in that one regard to plaintiff's classification, did receive two warnings, a suspension, and a demotion prior to his discharge. For the purposes of establishing a pattern of discrimination or disparate impact on females, all that the plaintiff has established is that one male, similarly classified in one respect, was discharged after progressive steps of discipline and that many other males were disciplined in various, almost haphazard, ways prior to their discharges. She has not offered evidence that other females were deprived of these disciplinary steps. Nor has she shown that she did not receive any warnings prior to discharge; Doctors Taylor, Allen, and Stinson all testified that plaintiff was informally warned during 1972 and 1973 that her performance was unsatisfactory, and her own letters to Dr. Taylor indicate that she feared her job was on the line.

An employment discrimination suit may be proven in other ways than those enumerated here; perhaps in ways yet to arise in case law. However, the crux of the proof must be the necessary link between the

plaintiff's protected status and the adverse employment action. That essential link is absent here; there is no clear proof pointing to sex bias against females; in fact, most of the proof in this case points the other way. There is nothing from which we may logically infer a bias against women held by the defendant or Dr. Taylor and exercised in the discharge of the plaintiff.

In summary, plaintiff has proven that she was a hard worker and a competent worker at defendant's laboratories for many years, and that she played a significant role in important research projects and in training new doctors. She established that Dr. Taylor relied on her for a long while to assist him in his work, and that she, too, relied on Dr. Taylor. By her own proofs, she established that she did not have a good working relationship with Dr. Allen, a male, or with Dr. Stinson, a female. She disagreed with some of their methods and criticized them to Dr. Taylor. Through his testimony and that of her children she established that her arduous schedule at the lab during the lambing seasons during 1971 and 1972 was hard on her and that she was very tired in the evenings. She has shown that she was an employee of the hospital although directly answerable to Dr. Taylor, a non-employee, and that the hospital personnel policies should have been applied to her. She has shown that some male hospital employees were treated differently than she was, but she has also shown that these males were treated differently from one another. In all these proofs, there is a total lack of indication of any sexual animosity against females, or any pattern of discrimination from which we might infer a sexually-biased motivation.

We make no finding as to the propriety of the defendant's employment practices or the propriety of this plaintiff's discharge. Absent sex discrimination, they are not in issue here. Moreover, since the plaintiff has failed to establish a prima facie case, the defendant need not proffer any defense.

In this regard, however, we note that the EEOC based its determination of "reasonable cause" on the defendant's reaction to the charge rather than on an analysis of the charge itself, finding that "no evidence has been adduced by [defendant] to persuade this Commission that their assertions are valid" and that "their assertions are inconsistent with each other" and therefore concluding that defendant's "reasons for discharging the female were pretextual" [plaintiff's Exh. 20]. Although we admitted this exhibit into the record, we cannot reach the issues on which the EEOC made its determination without first finding that plaintiff has established a prima facie case. So long as the EEOC employs standards and methods different from the federal courts for determining the validity of claims, court decisions are bound to differ frequently from EEOC determinations.

We conclude, as a matter of law, that plaintiff has failed to meet the original burden of proof under *McDonnell Douglas*. Defendant's motion will therefore be granted and a verdict directed in its favor.