James LEFTWICH, Plaintiff,

v.

UNITED STATES STEEL CORPORATION, Defendant.

Civ. A. No. 76–1516.

United States District Court,
W. D. Pennsylvania.

May 31, 1979.

J. Jerome Mansmann, Pittsburgh, Pa., for plaintiff.

Leonard L. Scheinholtz, Edward N. Stoner, Reed, Smith, Shaw & McClay, James T. Carney, U. S. Steel Corp., Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

### I.

### FINDINGS OF FACT

Plaintiff, James Leftwich, is a black man who was hired by defendant, United States Steel Corporation, on February 11, 1964.

Between 1964 and March of 1973 the plaintiff had worked up through the ranks of the defendant corporation's Duquesne Works in McKeesport, Pennsylvania, and had achieved the position of accounts payable clerk. He was the first salaried black employee in his division at United States Steel. There was testimony at the trial establishing that the plaintiff was not accepted well by all of his white co-workers and especially by some of his supervisors, who subjected him to ridicule. From 1964 until 1971 or 1972 his supervisor was a Mr. McCarthy who openly expressed his dislike of blacks. However, until 1973, his employ-ment history with the defendant was uneventful, and the plaintiff was a satisfactory employee. The accounts payable position which the plaintiff held in early 1973 was classified as "Job Class 5."

On April 8, 1973, plaintiff was promoted to a temporary "Job Class 6" job, which was to be open through December 29, 1973, due to vacations of other employees. This position was "incentive clerk" in the electric furnace division of the Duquesne Works. Plaintiff had been given a brochure to read on the incentive plan involved in this job and was instructed on the details of the job by his supervisor, Mike Nestor, before actually assuming the position. The job involved computing the incentive pay for employees who worked at the electric steel furnace. The normal break-in period for this job is a short one, and there is no formal training program for it. Other employees learned it in a short period of time.

The previous incentive clerk had been one Richard Guzewicz, a white man. When Mr. Guzewicz left that job he moved to another part of the plant. Therefore from March, 1973 to September, 1973, Mr. Guzewicz did not provide much assistance to the plaintiff in learning his new job.

Mr. Gerald Heim, a white employee who followed the plaintiff in the incentive clerk position, testified that he believed that he received more thorough training than had plaintiff. Mr. Leftwich claimed he was given the manual to read prior to beginning the job and that he was not given on-the-job training. Mr. Heim claimed that when he was assigned the job, Mr. Guzewicz had sat down with him for 1½ days of one-to-one training; Mr. Heim further stated that he could not have learned the job by simply reading a manual. However, Mr. Guzewicz testified that he gave both men about equal training time.

Plaintiff made many errors in computing the incentive pay of the workers in the electric furnace. Most of his errors were of the addition-subtraction-multiplication variety, although he made some other errors as well. In the first three pay periods that plaintiff held this position he made over

half a dozen mathematical errors resulting in underpayments or overpayments to United States Steel employees. When an employee was overpaid, the overpayment would be deducted from his next pay. Mr. Langett, the union representative, testified the Union had complained that the workers were quite upset because of this occurring so often.

On June 20, 1973, plaintiff was given a written warning for this unsatisfactory work. Plaintiff said he needed more time to do the job correctly. The warning was not grieved under the collective bargaining agreement applying to plaintiff. Plaintiff was granted two additional two-week pay periods to improve, with the understanding that the warning would be removed if he did.

In the next two pay periods, June 30 and July 14, Mr. Nestor, plaintiff's supervisor, checked plaintiff's work and found 14 errors before actual incorrect paychecks were issued.

On July 25, 1973, plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge, claiming that the company was discriminating against him by its actions surrounding this promotion.

He filed the same allegations with the Pennsylvania Human Relations Commission ("PHRC") on October 16, 1973. The EEOC determined that there was "no reasonable cause" to believe plaintiff had been discriminated against due to his race. The PHRC likewise determined that the facts disclosed during its investigation failed to substantiate plaintiff's allegations.

On August 3, 1973, in a meeting with his union representative present, the June 30 and July 14 errors were discussed. When plaintiff again claimed he needed more experience on the job he was granted another trial period.

In this trial period, a 6-week period, plaintiff made 5 more basic errors resulting in over 600 incorrect payments to employees.

As a result of the defendant corporation's dissatisfaction with plaintiff's work as an incentive clerk he was removed from this temporary position in September of 1973 and placed back into the permanent accounts payable clerk position, Job Class 5, which he previously held.

After he was returned to the Job Class 5 job, which was also after he had filed the discrimination charges, plaintiff's situation on the job became increasingly difficult.

In October, 1973, he was number nine on a seniority list for employees in his division. Having the proper seniority, he then bid for a promotion to Job Class 6 as an incentive clerk in the basic oxygen furnace ("BOF") division of defendant corporation's Duquesne Works. This job became available on a temporary basis due to an employee's illness. Although this was not the same incentive clerk position which he had previously held, it involved many similar duties. The defendant offered this job to Joseph Cabray, a white employee with less seniority than the plaintiff; thereafter plaintiff filed a grievance. The grievance was arbitrated. The subject of his prior 1973 errors was reviewed by the arbitrator, who found the jobs essentially identical and that plaintiff's six month trial period on the electric furnace job had been adequate. The arbitrator found that defendant did not violate the contract in awarding the temporary Job Class 6 position to Mr. Cabray, rather than plaintiff.

Plaintiff filed no charge with the EEOC concerning the temporary job given to Mr. Cabray, and the issue of whether that employment decision constituted discrimination is not before us.

Beginning sometime in 1973, the plaintiff's attendance at work began to decline. He was frequently ill or late.

Eventually the plaintiff was required to provide a doctor's excuse in order to substantiate absences from work when he reported off sick. There was testimony from several employees tending to establish that the defendant generally had a liberal policy toward tardiness and sick leave. Nicholas Ballinger, the plant's personnel director during the time in issue, testified that there

was no plantwide policy regarding doctor's excuses but that this was discretionary with the supervisors in individual departments. The plaintiff was required to produce doctor's explanations for his sick days whereas other employees were not. Moreover, plaintiff was required to secure doctor's excuses indicating not only that he was ill but also that he was unable to work. Plaintiff did adequately explain his sick days and provide proper medical excuses.

Another employee in plaintiff's division, Mary Jane B., was absent more often than he was in 1973–74 and was not required to provide excuses nor was disciplined. She was known by all the employees to be suffering from cancer; she died in 1974.

Plaintiff explained that his frequent tardiness was attributable to the fact that, as part of his work as an accounting clerk, he was responsible for picking up and delivering computer tapes from one end of plant operations to another. He would do this first in the morning, causing him to be late in arriving at his actual work location. However, there was other testimony indicating that plaintiff was also tardy during periods when he was not responsible for collecting computer tapes.

Several other employees had records of repeated tardiness. Gerald Heim, a white, who lived some distance from the plant and took public transportation to work was late by a least a few minutes almost every day. During the winter months, he might occasionally arrive over an hour late. His lateness was tolerated and an arrangement made whereby he compensated for his late arrivals by working during the lunch break.

Donna F., also white, was often late or missing from her position in the billing department. Mr. Ballinger testified that after she was disciplined, her attendance improved, and she is still employed. A Mr. M., who was white and also a known alcoholic, also had many absences and incidents of tardiness. He was disciplined four times, then sent for alcoholic rehabilitation and retained. The number of incidents involved with Ms. F. and Mr. M. is not before us. From April of 1973 until April of 1974, plaintiff's tardiness was documented by defendant on 44 occasions. The degree of tardiness varied widely—from four or five minutes on two occasions to two hours and fifty-five minutes on January 9, 1974. Of these forty-four occasions in one year, nineteen involved lateness of over twenty minutes and three involved lateness of over an hour and a half. (Defendant's Exh. 60).

During this same period of time Gerald Heim was late sixty-four times, ranging from four minutes to, on one occasion, forty-five minutes. On six occasions he arrived later than twenty minutes after starting time. However, the vast majority of these instances involved four to ten minutes (two times at four minutes; thirty-four times at five minutes; once at seven minutes; once at eight minutes; sixteen times at ten minutes) (Defendant's Exh. 61). No one else in the department was late more than seven times in this year, nor ever more than forty-five minutes late. One was never late.

Defendant's personnel director, Nicholas Ballinger, testified that although plaintiff was off ill more than most employees, and was often late, that the real reason for his being fired was his failure to call in and report that he would be late or out sick. This failure made it difficult for defendant to manage its daily work. The defendant's labor agreement with the United Steelworkers of America, of which plaintiff was a member, provided:

> "In recognition of the difficulties imposed on Management through failure of employees to comply with work schedules an employee reporting late for or absenting himself from work without just cause may be subject to discipline in accordance with the provisions of this Agreement. Employees shall, where practicable, give notice to the Company whenever they either report late or absent themselves for work."

(Defendant's Exh. 10, p. 56).

The defendant employs a policy of "progressive discipline," under which increasingly severe punishments are meted out to employees charged with violations of work

rules. After 1973, the following progressive steps were taken by the defendant in response to plaintiff's tardiness and failure to report off:

10–8–73 Warning. Failure to report off work: 10–5–73. Not paid for the day.

1–23–74 Warning—Pay withheld. Repetitive tardiness—Late periods not paid.

2–20–74 One Day Suspension for late reporting Off—45 Minutes Tardy.

3–21–74 Three Day Suspension for reporting off work late on date he went to hospital.

4–3–74 Four Day Suspension for reporting off from work late.

6–20–74 Five Day Suspension resulting in termination from employment for reporting off late.

The punishments on 10–8–73, 2–20–74, 3–21–74 and the termination of 4–3–74 were all grieved by the plaintiff. The grievance was sustained as to the 3–21–74 incident, but denied as to the others.

Following his discharge, plaintiff filed an EEOC charge on July 9, 1974. He filed the same allegations with the PHRC on the same date. The EEOC concluded that there was "no reasonable cause" to believe plaintiff's allegations of race discrimination and the PHRC concluded that there were not sufficient facts to support those allegations.

After the EEOC issued him right to sue notices, plaintiff filed this lawsuit on September 14, 1977.

## II.

### CONCLUSIONS OF LAW

This Court has jurisdiction over this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits discrimination in employment on the basis of race.

■ The plaintiff properly exhausted his administrative remedies prior to bringing suit on both his claims that: (i) he was not promoted to the electric furnace incentive clerk job because of race; (ii) he was discharged because of race. However, the Court is without jurisdiction to consider plaintiff's claim that he was the victim of race discrimination when the temporary BOF job was assigned to Mr. Cabray. Plaintiff filed no EEOC charge on this matter. *Bradford v. People's Natural Gas Co.*, 60 F.R.D. 432, (W.D.Pa.1973).

■ Although the decisions of the PHRC and EEOC and the labor arbitrators who heard plaintiff's grievances have all found, almost uniformly, that plaintiff's claims were unsupported by the evidence, we have considered the claims in de novo fashion as we are required by law to do, *Alexander v. Gardner-Denver*, 415 U.S. 36, 60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). It should also be noted that our standards for reviewing evidence in a Title VII case are different than those used by administrative agencies, *see Watson v. Magee Women's Hospital*, 472 F.Supp. 325 (W.D.Pa.1979). These standards were established by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Under *McDonnell Douglas* a Title VII case is divided into three phases. First the plaintiff must demonstrate a prima facie case of discrimination. Then the defendant is called upon to articulate a legitimate non-discriminatory reason for its action. Finally, the plaintiff is afforded an opportunity to show that the proffered reason is in fact a pretext designed to cover what is actually an illegal discrimination. *See also Whack v. Peabody & Wind Engineering*, 595 F.2d 190 (3d Cir. 1979). The ultimate burden of persuasion that there has been illegal discrimination resides always with the plaintiff. *Id.*, at 193.

We will consider each of the plaintiff's two viable claims under this tripartite analysis: (1) was a *prima facie* case of racial discrimination established; if so, (2) did the defendant proffer a valid business purpose or other non-discriminatory reason for its actions; and, if so, (3) were the reasons given by defendant a "cover-up" of illegal discrimination?

■ Although the order, or phases, of proof in a Title VII case are now well established, what must be shown to establish a prima facie case is less clear. The Supreme Court in *McDonnell Douglas* explained in a footnote: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 677, n. 13, 93 S.Ct. at 1824. However, drawing on general principles of *McDonnell Douglas* and specific rulings in several district court cases, we hold that to establish a prima facie case the plaintiff must establish three elements: (1) that he is a member of a protected class; (2) that he was the object of adverse employment action; and (3) that there was a causal relationship between his membership in the protected class and the adverse action which he suffered. *See, Rivers v. Westinghouse Elec. Corp.;* 451 F.Supp. 44 (E.D.Pa.1978); *Pearson v. Borden Metals Products Co.,* 434 F.Supp. 840 (D.C.Ala. 1977); *Detroit Police Officers Assn. v. Young,* 446 F.Supp. 979 (E.D.Mich.1978). These three elements must be established before the burden shifts to the defendant.

The plaintiff is a member of a protected class—a racial minority—and it has been established that he was denied a Job Class 6 position and was involuntarily terminated. It is the last essential element—proving that his race was *the* reason, or *a* reason for his adverse experiences—that is the most difficult and elusive element of his burdens of proof.

### A. *The Incentive Clerk Job*

Plaintiff filed his first charge of discrimination while he was on his temporary assignment at the Job Class 6 position of electric furnace incentive clerk. He argues that the different, better, training given to whites on the electric furnace job indicates that he was discriminated against because of his race.

■ There was testimony from one other employee, Gerald Heim, a white man, that he did receive better training for the electric furnace job than had plaintiff. Establishing disparate treatment between members of two classes or races is a legitimate way of establishing a prima facie case of discrimination. *See Johnson v. University of Pittsburgh,* 435 F.Supp. 1328 (W.D.Pa. 1977); *EEOC v. Local 14, Int'l Union of Operating Engineers,* 553 F.2d 251 (2d Cir. 1977). However, here Mr. Heim's testimony was countered by other evidence that there was no formal training period, that other employees learned the job quickly, and that plaintiff was given several extensions of his trial period on the new job in order to learn its functions. In his case the plaintiff has only established that one white received better training than he did.

■ From what we heard at trial we do not doubt that the environment was unfriendly to plaintiff when he came to the accounting department some years prior to the instances now in dispute. There was testimony that his supervisor, a Mr. McCarthy, now deceased, disliked blacks. We do not condone what we heard of those attitudes. However, as unfortunate as it may be, it is beyond the power of our courts to correct or improve attitudes of individuals. It is only when such discriminatory attitudes take the form of adverse action against individual employees that the court is empowered—or as a practical matter, would be able—to enforce changes. *E. g., United States v. Wattsburg Area School Dist.,* 429 F.Supp. 1370 (W.D.Pa.1977). Of course, where racial *animus* is established, it is fair evidence from which an inference of discrimination could be drawn. From the facts before us, such inference would require a large logical leap. Plaintiff was black and did suffer hostility, at least from Mr. McCarthy. However, he was placed in the temporary electric furnace job when his chance at such a position was opened by the normal seniority process. When he failed to function in the job properly, he was extended several additional trial periods to improve. These facts establish a very weak case of disparate treatment in the matter of the electric furnace job. As the Supreme Court noted in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 128 (1971):

"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has prescribed.

What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

■ However, because the evidence of racial *animus* on the part of plaintiff's supervisor establishes a serious basis from which to infer discriminatory motivation, we will assume that a *prima facie* case has been established. Therefore, the defendant must justify the treatment of plaintiff in removing him from the electric furnace job. *Whack, supra*, at 193–194. This it has amply done. The number, frequency, and seriousness of plaintiff's errors on this job was not disputed. Exhibits established that hundreds of incorrect payments to United States Steel employees resulted from plaintiff's errors during his second trial period alone. Good business management or job efficiency are recognized defenses to Title VII claims. *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (M.D.Pa.1977), *aff'd* 582 F.2d 1275 (3d Cir. 1978); *EEOC v. Service Container Corp.*, 418 F.Supp. 898 (D.Okl.1976).

Although plaintiff did not deny that he made many errors on the job, he attempted to show that this was a pretext for his demotion, consistent with the *McDonnell Douglas* formula for refuting a valid defense. Although there was some testimony that serious mathematical errors were made by some white employees in the same and similar positions, this evidence did not establish the number or frequency of such errors nor whether those white employees were extended additional trial periods on those jobs nor whether they were disciplined in any way. We therefore conclude that any disparate treatment between plaintiff and other employees in the matter of the denial of the electric furnace job was justified by the ongoing and extremely poor performance of plaintiff in that position.

## B. *The Discharge*

Although plaintiff's record of late arrivals, submitted into evidence, might have been sufficient to justify discharge, and his general attendance was hardly exemplary, the defendant has asserted that its sole reason for discharging him was his failure to properly call in to his employer to report when he would be late or ill. In fact, the series of disciplinary steps taken prior to his discharge involved primarily this failure to call in.

However, as plaintiff has logically argued that it is difficult to present a case where only the plaintiff's record in that regard is available, we have considered all these factors.

As with his earlier charge, plaintiff has attempted to establish the link between his protected status and the adverse action that befell him by showing that he was treated differently than white individuals at his plant. He did produce evidence tending to show that the defendant followed few strict policies in regard to tardiness, excuses for absences, or recording aberrations. It was established that a great deal of discretion was placed in individual supervisors. Although there was testimony that many employees were less than punctual, there was no evidence that established an individual record as bad as that of plaintiff's. Our findings of fact demonstrate this mathematically.

On the subject of the late or missing call-offs, we have no evidence to compare with plaintiff's record. There was evidence, however, tending to establish that plaintiff was treated more strictly than other employees in the requirement of providing doctor's excuses.

■ Reviewing all of plaintiff's evidence, we once again find it difficult to conclude that a pattern or practice of disparate treatment is present. None of the white employees with whom plaintiff com-

pared himself had a record of tardiness like plaintiff's. There is little evidence from which we may infer that plaintiff was treated differently based on his race, *see Kirkland v. New York State Dept. of Correctional Services*, 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), where those compared are not similar in fact.

However, assuming for the sake of argument that a *prima facie* case were established, we would again have to conclude that the defendant offered sufficient explanation to justify its discharge of plaintiff. Either his tardiness or failure to call in would have been sufficient grounds to justify discharge. The fact that other white employees were not also discharged does not establish that the defense is a pretext where none of those employees had a disciplinary record comparable to plaintiff's.

Therefore, we conclude that to the extent that plaintiff has made out a prima facie case of disparate treatment the defendant has proffered satisfactory reasons for its actions against plaintiff. It has not been established that either the refusal of the incentive clerk job or the discharge of plaintiff were racially motivated.

In light of the foregoing, we will enter a verdict for the defendant.