Jimmy **WRIGHT,** Plaintiff,

v.

**ALLIS–CHALMERS,** Defendant.

**Civ. A. No. 74–M–459.**

United States District Court,
N. D. Alabama, M. D.

April 7, 1980.

**350**

Oscar W. Adams, Jr., Birmingham, Ala., for plaintiff.

William F. Gardner, Cabaniss & Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., John A. Fillion, Gen. Counsel, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

McFADDEN, Chief Judge.

This case, filed on May 15, 1974 and originally styled *William E. Hughley et al. v. Allis–Chalmers et al.*, began as a class action. Plaintiff, Jimmy Wright, one of the seventeen named plaintiffs, asserted the individual claim that he had been discharged because of race. The court approved a Consent Decree on July 15, 1977, which resolved all claims except Wright's, which was severed by agreement for subsequent determination.

The order of July 15, 1977 defined the issue:

The issue shall be whether plaintiff Jimmy Wright was discharged from employment with defendant Allis–Chalmers because of his race.

The court having tried that issue, enters this memorandum of law in lieu of findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

Jimmy Wright is black and was employed at the Allis–Chalmers plant in Gadsden, Alabama from July 21, 1969 until October 5, 1973, when he was terminated because of misconduct. Wright contends his discharge was racially motivated and that whites were guilty of conduct as bad or worse than his and were not fired. At termination, Wright was holding the Steam Cleaner–Production job in the Plate Shop, and was the Union Steward.

After lunch on October 1, 1973, Wright was instructed by his foreman Bobby Lowe to assist in the refueling of a lift truck. The refueling required two employees, one to steer the empty lift truck and the other to push it with another lift truck to the fuel pump. Wright was directed to steer the empty lift truck. Wright responded to this assignment with various negative comments, such as "Don't you see me working"? and, "Why me? Why me"? He admits that he "might" also have stated to his foreman that it was not his job to do anything like that. After repeating his instructions, Lowe left the area.

According to Wright, he told his foreman he would not assist in the refueling because the empty lift truck was not his. The company's evidence was to the contrary. Even if it is assumed that Wright was correct, it is immaterial. The refueling operation required two employees, and the directive was a valid order and due to be carried out even if the machine was not assigned to plaintiff.

Thereafter, Lowe returned to Wright and again instructed him to assist in the refueling. Wright responded, "Get me a Shop Steward." It is not clear how many times Lowe instructed Wright to assist in the refueling. It is clear that Wright unequivocally stated that he was not going to do it.

Wright finally carried out the assignment after being told he would be suspended if he continued to refuse to do it. Wright, however, pretended he had not done so when questioned again about the refueling. Wright told Lowe, "that lift might have some gas in it." Lowe replied it had been empty and presumably still was because of Wright's stated refusal to refuel it. Wright then got on the lift truck and drove it in circles around Lowe while saying, "The register's full."

Wright again told Lowe to get the Union Steward. When Lowe asked him to identify the nature of his grievance, Wright made the statement which culminated in his discharge.

There is some divergence in the evidence regarding the words used, but it is undisputed that Wright invited the foreman to step outside for the purpose of fighting. Lowe told him to punch out. Wright refused to do so, and a guard was called to escort him from the plant.

Upon plant procedure, a foreman was not authorized to discharge an employee, but could suspend subject to review by higher management. The final decision as to the appropriate discipline was made by the Employee Relations Manager, who in this case discharged Wright on October 5, 1973.

A grievance protesting the discharge was filed and processed to arbitration. The arbitrator held "that the discharge of the grievant, Jimmy Wright, was for just cause and the grievance is denied."

This would appear to end the matter. Plaintiff refused a valid order and then challenged his foreman to fight. The arbitrator found sufficient grounds for the discharge. Plaintiff, however, contends that others, equally guilty of misconduct but white, were not fired. Wright further attempts to excuse his challenge to fight on the ground that he did so in response to a racial epithet uttered by Lowe. The credible evidence is that no such epithet was spoken by Lowe.

Wright filed no grievance accusing Lowe of any alleged discrimination or unfair treatment. As a Union Steward, he knew full well how to write and file grievances, and he did so both for himself and for other employees, but at no time did he file any grievance against Lowe.

Prior to the arbitration hearing, Wright attended a grievance meeting on his discharge. At no time in the meeting did he make any mention of any alleged racial epithet by Lowe or of any alleged discrimination by Lowe. He replied in the negative to a specific inquiry if he thought race had anything to do with his discharge.

Wright testified at the arbitration hearing, where, for the first time, he asserted a discrimination charge against Lowe. However, his accusations at that time did not include any alleged racial epithet. As the arbitrator observed, "At no time did grievant accuse the foreman of having used any offensive language to him or about him." When he filed a charge with the EEOC regarding the discharge, he included no claim as to a racial epithet.

Wright's answers to interrogatories made no mention of the epithet. These answers to interrogatories were filed in 1975, and it may be presumed that the events occurring on October 1, 1973 were fresher in his mind in 1975 than they were at the time of trial, nearly six years later. If the accusation against Lowe were true, it would seem that it would have been included in answers to interrogatories asking for all the facts on which the discrimination claim was based.

Moreover, Wright's deposition and court testimony were significantly different. His testimony on deposition was that the epithet came after Wright had challenged Lowe to fight, while here it was said to have come before the challenge.

■ The accusation first made in this court, many years after the event, despite several logical opportunities to do so, makes the accusation lacking in credibility and suggests after–the–fact invention.

While Wright contends that the epithet was overheard by another employee who happened to be nearby, the evidence establishes that the employee was not even in the plant at the time.

■ Even if any such language were used, it would have called for redress, but not in the form of a challenge to fight. *Walker v. Abex Corp.*, 351 F.Supp. 147 (E.D.Mo.1971). In that case, the plaintiff was discharged after his foreman had ordered him to return to work in "crude language" and the plaintiff responded by hitting him with a crowbar. The court held that "the sole cause for which defendant discharged plaintiff was his admittedly unlawful assault upon Price with a deadly weapon." The plaintiff in *Lazard v. Boeing Co.*, 6 FEP Cases 354 (E.D.La.1972), struck his supervisor after the supervisor allegedly "called him names or used some epithets." The court held that:

> The discharge was completely justified. He was not discharged because of his color. It's just that this company simply could not tolerate an employee assaulting one of its supervisors.

▇ While plaintiff's conduct on the date of his suspension is sufficient grounds for discharge, absent a showing that it was in fact a pretext for racial discrimination, conduct prior to the date of his discharge is also relevant. As stated in *Capers v. Long Island Railroad*, 429 F.Supp. 1359 (S.D.N.Y. 1977):

> Additionally, Harris' past conduct as an ASM including the reprimands and notices of his poor performances in 1974 and 1975 and the activities and evidence of insubordination surrounding his 60 days suspension in 1975 must be considered in upholding his present removal . . .
>
> Plaintiff's overall employment record and the conduct that triggered his November 11th dismissal gave the LIRR good, nondiscriminatory grounds to remove him.

429 F.Supp. at 1366.

During his employment, Wright received the following disciplinary suspensions and discharges:

(a) Suspension on June 11, 1970 for sleeping;

(b) Suspension on August 13, 1970 for refusing to perform a work assignment;

(c) Suspension on July 18, 1972 for refusing to perform a work assignment;

(d) Suspension on May 5, 1973 for refusing to continue working and leaving the plant without permission;

(e) Discharge on June 15, 1973 for falsification of work tickets, refusing to perform work, and inattention to duties. He was reinstated from that discharge in settlement of his grievance under the union grievance procedure;

(f) Suspension on September 17, 1973 for refusing to perform a work assignment;

(g) Discharge on October 5, 1973 for refusing to perform a work assignment and challenging his supervisor to fight.

In addition to these suspensions and discharges, Wright was given warnings and counselling regarding job performance and attitude. His attendance record was poor. He refused to carry out assignments and failed to perform duties which were a regular part of his job without receiving discipline.

It is clear from the evidence that Wright had an extremely negative attitude toward work assignments and instructions. As accurately described by the arbitrator who upheld his October 1973 discharge:

> The Company has exhibited a great deal of patience with grievant in tolerating such repetitious violations of such a well-established principle of industrial relations as the requirement that employees must obey the instructions of the supervisors. It seemed to the Referee after hearing grievant's testimony that this was the crux of the whole problem. . .
>
> It is not surprising that an employee with the attitude about his duty to perform assignments as discussed above would receive frequent disciplinary actions. The whole tenor of grievant's testimony was that he had a right to second-guess every assignment he was given . . . He seemed to be a person preoccupied with the need to show that he didn't have to do things he was instructed to do. He always had to do more, less or something a little different, or at least protest if he did perform assignments the way he was instructed. This sort of attitude causes a more or less constant threat of confrontation with supervision and especially when the employee is a Union officer.

▇ If the truth of the accusations against Lowe is assumed, Wright still would not be entitled to relief. The fact of discrimination alone does not establish the illegality of a challenged action. There must be a causal nexus with the disciplinary action in question, so that the challenged discipline would not have been received by the employee but for the improper conduct of the employer. As stated in *Taylor v. Honeywell, Inc.*, 8 EPD ¶ 9493, p. 5223 (D.Colo.1973), *aff'd* 497 F.2d 1382 (10th Cir. 1974):

> In order for the plaintiff to succeed in this litigation there must be demonstrat-

ed by the required burden of proof that the discrimination practice or policy of the defendant was the cause of the claimed injury. . . . In fact, 42 U.S.C.A. § 2000e–5(g), necessitates a finding of causation.

Thus a nexus must be established between the discriminatory practice and the contended injury . . .

The Court views the issue of causation significant in this action and plaintiff has failed to establish causation by a preponderance of the evidence.

In *Watson v. Magee Women's Hospital*, 472 F.Supp. 325 (W.D.Pa.1979), the plaintiff, who had been discharged, contended that her supervisor was opposed to women working when they had children at home. The court held that it might be true her supervisor entertained such a belief but that the evidence failed to establish a causal relationship between such a belief and the plaintiff's discharge. The court stated:

To permit such an action, without clear proof of a link between the plaintiff's protected status and the adverse employment decision, would cause Title VII to become a vehicle for providing compensation following an adverse employment decision to every person in a protected class–that is, to every citizen of either sex, any race, origin or nationality.

472 F.Supp. at 330.

The allegedly unlawful motive of the defendant employer must be a "substantial factor"–or a "motivating factor" in the employer's decision. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

It is quite clear that Congress did not intend to make employers liable for dismissals or refusals to promote that are only partially based on discriminatory considerations.

*Gillin v. Federal Paper Board Co.*, 12 EPD ¶ 11,025 (D.Conn.1975).

■ There was no causal nexus between the accusations against Lowe and Wright's discharge. The decision to discharge Wright was not made by Lowe, but by Employee Relations Manager James Ash-

craft after intermediate review in the chain of management. None of the persons reviewing the matter above Lowe has ever been accused by Wright of any discrimination or prejudice.

The order of proof in a discharge case is summarized in Schlei & Grossman, *Employment Discrimination Law* (BNA, 1976), pp 511–512:

The plaintiff must meet the initial burden of proving that he was a member of the protected class, that he was discharged, and produce evidence of disparate treatment from which the court may infer a causal connection between the basis and the discharge.

The employer meets its initial burden of rebutting the inference of a causal connection by articulating a legitimate, nondiscriminatory reason for the discharge. The final burden then falls on the plaintiff to demonstrate that the reason given by the employer for the discharge "was in fact pretext."

See also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1979).

Plaintiff, Jimmy Wright, failed to prove a racial motive for discharge. He further failed to produce evidence of a causal connection between the allegedly discriminatory basis and his discharge.

Moreover, even if it is assumed that the plaintiff produced any evidence of a causal nexus, the defendant met the burden of rebuttal by showing a legitimate non–discriminatory reason for the discharge.

The plaintiff failed to show that the reason given by the defendant for the discharge was pretextual.

The discharge of plaintiff Jimmy Wright was based on the legitimate and non–racial grounds of his prior disciplinary record and his conduct and statements on October 1, 1973 and was not in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*).

**354**

The civil rights statutes are designed to provide for equality and do not insulate an employee from discharge for failing and refusing to carry out the assigned duties of his job and to obey legitimate instructions to perform the duties of the job . . .

*Horton v. M & B Metal Products,* 11 FEP Cases 1039 (N.D.Ala.1974).

Wright's discharge was the result of his refusal and failure to perform the duties of the job and to comply with the instructions of the foreman and his challenge to fight and was a lawful exercise of the defendant's right to expect the members of its work force to perform their jobs and not to challenge superiors to combat.

In *Thurston v. General Electric Co.,* 8 FEP Cases 803 (N.D.Ohio 1974), the plaintiff had told a foreman he would "knock him on his _____." In holding that the plaintiff's discharge was not racially discriminatory, the court stated that "[i]nsubordination toward supervisors, abusive language and job performance are valid reasons for release of employees" and that "Title VII actions do not strip the employer of his right to require efficient service from employees."

A court may not order the reinstatement of a plaintiff who was discharged for any reason other than unlawful discrimination. *Horton v. M & B Metal Products Co.,* supra. So also here, plaintiff Jimmy Wright was discharged for reasons other than unlawful discrimination.

Final judgment in conformity with this memorandum opinion will be entered.